933 F.2d 1561
 ALABAMA DRY DOCK AND SHIPBUILDING CORPORATION, Petitioner,
v.
John W. SOWELL, Respondent,
and
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Party-In-Interest.
 No. 89-7868.
 United States Court of Appeals,
Eleventh Circuit.
 June 24, 1991.
 
 Winn S.L. Faulk, Mobile, Ala., for petitioner.
 Michael Hertzig, Washington, D.C., John Foster Dillon, Rebecca J. Ainsworth, Maples & Lomax, Pascagoula, Miss., for respondent.
 Petition for Review of an Order of the Benefits Review Board.
 Before EDMONDSON and COX, Circuit Judges, and WISDOM*, Senior Circuit Judge.
 COX, Circuit Judge:
 
 
 1
 In this case, Alabama Dry Dock and Shipbuilding Corporation (ADDSCO) appeals the Benefits Review Board's (the Board) affirmance of an award of benefits for hearing loss made by an Administrative Law Judge (ALJ) to John Sowell under the Longshore and Harbor Workers' Compensation Act (LHWCA or the Act), 33 U.S.C.A. Secs. 901-950 (1986). We affirm.
 
 I. Background
 
 2
 Sowell worked for various shipyards from 1941 to 1969. He worked for ADDSCO for a brief period in 1945,[1] for one week in 1963, and for five weeks in 1969. After leaving ADDSCO in 1969, Sowell never again worked in maritime employment; he became a self-employed minister. In 1980, at the urging of his parishioners, he had his hearing tested. An audiogram was taken, and after the test the doctor gave it to Sowell, along with its interpreting report, in a sealed envelope. The doctor told Sowell to take it to a hearing aid center and be fitted for a hearing aid. According to Sowell, he did so without ever looking at the test or report.
 
 
 3
 In 1986 Sowell was tested again; his audiologist and doctor concluded that he had sustained approximately a 66% binaural loss of hearing due almost entirely to noise exposure. Both doctors agreed that the 1986 test could not be reliably compared to the 1980 test because the 1980 test was not conducted using the same measuring techniques. A copy of the 1986 audiogram and its report was mailed to Sowell's attorney, who gave Sowell a copy. About two weeks later Sowell filed his notice of injury and claim for benefits.
 
 
 4
 After a hearing, an ALJ decided that the claim was timely filed under the 1984 amendments to the LHWCA, and that Sowell had shown that the disability was connected to his work in maritime employment. The ALJ therefore found in favor of Sowell, holding ADDSCO responsible for the entire hearing loss revealed by the 1986 audiogram because it was the last maritime employer for whom Sowell worked. On reconsideration, the ALJ modified the method by which he determined Sowell's average weekly wage and the resultant award of benefits, but otherwise reaffirmed his decision. In an unpublished order, the Board affirmed the ALJ's decision in all respects.
 
 
 5
 ADDSCO here renews its arguments that Sowell's claim was not timely filed, that the ALJ erred in determining Sowell's average weekly wage, and that the ALJ erred in determining the degree of Sowell's hearing loss chargeable to ADDSCO. As party-in-interest in this case, the Director of the Office of Workers' Compensation Programs of the Department of Labor (Director) argues that the claim was timely filed, but that the ALJ erroneously fixed the time of injury from which to calculate Sowell's average weekly wage and award of benefits.
 
 II. Standard of review
 
 6
 We review the Board's decisions to determine whether the Board has adhered to its statutory standard of review and whether it has erred in interpreting the law. Argonaut Ins. Co. v. Patterson, 846 F.2d 715, 718 (11th Cir.1988). This court, and the Board, must uphold the factual determinations of the ALJ if they are supported by substantial evidence in the record as a whole, Lollar v. Alabama By-Products Corp., 893 F.2d 1258, 1261 (11th Cir.1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1262 (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). Because the Board is essentially an adjudicator, rather than an administrator, its interpretations are entitled to no special deference. See Potomac Elec. Power Co. v. Director, Office of Workers' Comp. Programs, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514-15 n. 18, 66 L.Ed.2d 446 (1980); William Bros. v. Pate, 833 F.2d 261, 264 (11th Cir.1987). We owe deference to official expressions of policy by the Director, who does administer the statute, Lollar v. Alabama By-Products Corp., 893 F.2d 1258, 1262 (11th Cir.1990), but settled law precludes us from affording deference to an agency's litigating position. McKee v. Sullivan, 903 F.2d 1436, 1438 n. 8 (11th Cir.1990); William Bros., 833 F.2d at 265.
 
 III. Discussion
 A. Statute of limitations
 
 7
 At the threshold, we must decide whether Sowell's claim is barred by the statute of limitations. To do so, we must decide what version of the Act is applicable to Sowell's claim. The LHWCA was amended in 1984, and Sowell, the Board, and the Director all contend that the 1984 amendments control this case. ADDSCO disagrees.
 
 
 8
 Before 1984, the time for filing a claim under the LHWCA expired one year after the time "the employee ... [became] aware, or in the exercise of reasonable diligence should have been aware, of the relationship between the injury ... and the employment." 33 U.S.C.A. Sec. 913(a) (1982). The act still contains that requirement. In 1984, however, Congress amended the act to require in addition that "[t]he time for filing ... a claim for compensation ... shall not begin to run in connection with any claim for loss of hearing ... until the employee has received an audiogram, with the accompanying report thereon, which indicates that the employee has suffered a loss of hearing." 33 U.S.C.A. Sec. 908(c)(13)(D) (1986).[2] Congress further provided that unless it specified otherwise, "the amendments made by this Act shall be effective on the date of enactment of this Act and shall apply both with respect to claims filed after such date and to claims pending on such date." Id. Sec. 901 note. Because Congress did not specify a different effective date for the amendment contained in section 908(c)(13)(D), it became effective on September 28, 1984, the amendments' date of enactment. The Board consistently has held that the 1984 amendments, including the new audiogram requirement, apply to claims filed after the effective date, regardless of when the claim arose. See, e.g., Manders v. Alabama Dry Dock & Shipbuilding Corp., 23 BRBS 19, 22-23 (1989) (hearing loss claim timely filed in 1986 though claimant had retired in 1965).
 
 
 9
 ADDSCO argues that Sowell cannot claim the benefit of the 1984 amendments because his claim was time-barred years before those amendments were even a gleam in Congress' eye. ADDSCO reminds us that Sowell last worked for ADDSCO in 1969, and points us to testimony that seems to indicate that Sowell connected his hearing problems with his employment in the 1960s. ADDSCO thus argues that Sowell's limitation period should have begun to run on his final day of employment with ADDSCO in 1969, and expired one year later.[3]
 
 
 10
 ADDSCO's interpretation is at odds with the plain terms of the 1984 amendments. The statute clearly provides that the amendments apply to claims filed after September 28, 1984; Sowell's claim was filed in 1986. The amendments' new requirement--that the limitation period for a hearing loss claim does not begin to run until the employee receives a conforming audiogram--would thus seem to apply to Sowell's claim. ADDSCO nonetheless argues that Congress could not have intended to revive claims long since dead, especially in view of the difficulties of proof employers would face in defending decades-old claims. ADDSCO points us to no legislative history that would support its interpretation, nor can we find any.
 
 
 11
 Furthermore, ADDSCO's reading of the statute would force upon Congress' words a rather strained construction. The provision that "the amendments made by this Act shall be effective on the date of enactment of this Act and shall apply ... to claims filed after such date" (emphasis added) is obviously not necessary to apply the new law to claims arising after the effective date. The only sensible reading of the provision, then, is that Congress was addressing claims that arose before the effective date of the statute but were filed after the effective date.
 
 
 12
 Once we have concluded that Congress was addressing claims that arose before the statute's effective date, the improbability of ADDSCO's reading becomes obvious. Because ADDSCO's interpretation posits that Congress could not have meant to resurrect claims for which the statute of limitations had expired before the effective date, Congress could not have been addressing any claims that arose before September 28, 1983, one year before the effective date of the statute, because such claims would have been time-barred before Congress ever enacted the amendments. In other words, ADDSCO argues, when Congress said that the 1984 amendments "shall apply ... with respect to claims filed after" the effective date, Congress really meant to say that the amendments would apply to claims arising no more than one year before September 27, 1984, and filed after September 27, 1984. To accept ADDSCO's interpretation, we would have to believe that to express this rather precise concept, Congress chose the statutory command that the amendments "shall apply ... with respect to claims filed after such date." We do not. Instead, we conclude that Congress intended the natural implication of the language Congress chose: the 1984 amendments apply to claims filed after September 27, 1984, whenever they arose.
 
 
 13
 The Ninth Circuit has considered the meaning of a different part of this provision and reached a similar conclusion. In Osmundsen v. Todd Pacific Shipyard, 755 F.2d 730 (9th Cir.1985), the court considered the statute's instruction that the amendments "shall apply ... to claims pending on [the effective] date," 33 U.S.C.A. Sec. 901 note (emphasis added), to determine "whether Congress' extension of the limitations period would govern cases for which ... [the] limitations period had run prior to the date of enactment." Osmundsen, 755 F.2d at 732.
 
 
 14
 The Ninth Circuit held that "[a] claim not yet finally resolved remains 'pending' for purposes of Section 28(a) [now contained in 33 U.S.C.A. 901 note]." Id. The court concluded by noting that "[e]xtending a statute of limitations does not violate due process, even if the right of action has been time barred." Osmundsen, 755 F.2d at 733. The court in Osmundsen thus held that the claim was timely filed under the 1984 amendments to the LHWCA.
 
 
 15
 Our predecessor circuit also reached a similar result when considering the 1972 amendments to the LHWCA. As noted above,[4] one of the 1972 amendments provided that the limitations period did not begin to run until the employee was (or should have been) aware of the relationship between the injury and the employment. In Cooper Stevedoring v. Washington, 556 F.2d 268, 272-73 (5th Cir.1977), the court applied the 1972 amendments even though the injury had occurred three months before their adoption. The court said that retroactive application of the 1972 amendments was "in accord with the established principle ... that 'statutes of limitation go to matters of remedy, not to destruction of fundamental rights.' " Id. at 273 (quoting Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945)).
 
 
 16
 Our research and reflection therefore leave us convinced that when Congress provided that the 1984 amendments would "apply ... with respect to claims filed after" the statute's effective date, it meant just that, regardless of when the events underlying the claim occurred. We are aware of the implications of our decision. We are reluctant to ascribe to Congress an intent to amend a statute of limitations in a way that revives a potentially large number of claims that would otherwise have been time-barred decades ago. However, the plain language of the statute leaves us no choice but to reach the decision we reach today.
 
 
 17
 ADDSCO urges, however, that even if the 1984 amendments apply to this case, Sowell's claim is still untimely, because Sowell received in 1980 an audiogram sufficient to start the limitations period. Sowell argues, and the ALJ found, that Sowell did not "receive" his audiogram within the meaning of the Act because his doctor gave it to him in a sealed envelope, which he never opened, with instructions to take it directly to a hearing aid clinic. Because the purpose of the audiogram requirement is to ensure that a claimant knows of an employment-related hearing loss, the ALJ reasoned that Sowell's ignorance of the contents of the audiogram precluded a finding that he had received it within the meaning of the Act. ADDSCO counters by observing that statutory language is presumed to have its common meaning, and there can be no doubt that Sowell "received" his audiogram within the common meaning of the word. What he did or did not do with it, argues ADDSCO, is immaterial.
 
 
 18
 The parties also disagree about whether the audiogram was technically sufficient to begin the limitations period. Sowell argues that because the audiogram was not conducted in accordance with the current version of the AMA Guides to the Evaluation of Permanent Impairment, it cannot start the period running. See 33 U.S.C.A. Sec. 908(c)(13)(E). ADDSCO counters that it is hardly fair to require a 1980 audiogram to conform to the 1984 edition of the AMA Guides, that federal regulations exempt audiograms performed before December 28, 1984, from that requirement, see 20 C.F.R. Sec. 702.441 (1990), and that the 1980 audiogram does in fact conform to the version of the AMA Guides then in effect.
 
 
 19
 We need not decide these questions. The act requires that a hearing loss claimant both receive an audiogram and be aware of the connection between the disability and the employment. The ALJ found as a matter of fact that Sowell was not aware of the relationship between his hearing loss and his employment until after his 1986 audiogram. Our review of the record convinces us that the ALJ's finding is supported by substantial evidence in the record. Sowell testified that he was unaware that he had a serious hearing problem until informed by his parishioners in 1980. In a deposition admitted at the hearing, Sowell further testified, "I couldn't say exactly the day I lost my hearing. I can't do that because I was examined by this guy, this doctor here in Mobile [the 1986 audiogram], and his diagnosis is what I had to go on." This testimony provides substantial evidence for the ALJ's finding that Sowell was unaware he had an employment-related hearing loss until after the 1986 audiogram. Because the statute of limitations for Sowell's occupational disease claim could not begin to run until Sowell was or should have been "aware ... of the relationship between the injury ... and the employment," 33 U.S.C.A. Sec. 913(a), we affirm the ALJ's decision that Sowell's claim was timely filed.[5]
 
 
 20
 B. Time of injury for compensation of hearing loss claims
 
 
 21
 The Director argues that the ALJ incorrectly determined the time of injury for compensation purposes to be the date of Sowell's second audiogram, resulting in an erroneous calculation of average weekly wage and benefits. According to the Director, the error likely results from the ALJ's (and the Board's) misinterpretation of the statutory language in Section 910(i).[6] That paragraph of the statute, under the heading "Determination of pay," reads as follows:
 
 
 22
 For purposes of this section with respect to a claim for compensation for death or disability due to an occupational disease which does not immediately result in death or disability, the time of injury shall be deemed to be the date on which the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the death or disability.
 
 
 23
 33 U.S.C.A. Sec. 910(i) (1986). The Director argues that this paragraph of the statute is inapplicable, because although hearing loss is an occupational disease, it is not an "occupational disease which does not immediately result in death or disability."
 
 
 24
 The Director cites standard reference works on hearing loss and workers' compensation to argue that hearing loss is unlike long-latency occupational diseases, such as black lung or asbestosis, which can lie essentially dormant in the body for many years after an employee has left his employment before progressing to the point where they are disabling. By contrast, according to the Director, occupational hearing loss does not get worse once the employee leaves the employment. Because the employee has incurred the full measure of compensable disability on the last day of employment, the Director contends, hearing loss is an occupational disease which does immediately result in death or disability, making Section 910(i) irrelevant to determining the time of injury for compensation purposes in hearing loss cases. However, Section 910 does not specify the time of injury used to calculate compensation for hearing loss cases, and the Director points us to no statutory language or legislative history addressing the issue.
 
 
 25
 If the Director's argument is incorrect, and hearing loss is an occupational disease which does not immediately result in death or disability, Section 910(i) clearly gives the time of injury for compensation purposes, and the ALJ is due to be affirmed. If the Director is correct, the statute appears silent on the time of injury for compensation of hearing loss and any other occupational disease which does immediately cause death or disability.
 
 
 26
 The Director contends that the appropriate time of injury for compensation of hearing loss claims is the date on which the disabling condition is complete--the date of last exposure to the workplace noise. However, the Director's argument is based on his view of sound policy, rather than on statutory language or any other indication of legislative intent. Because the statute does not explicitly answer the question, we will look to legislative history to see if we can determine Congress' intent on the question. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1559 (11th Cir.1989) ("If the statute is in any way ambiguous, then the court must consider the statute's legislative history"); see also Continental Can Co. v. Mellon, 825 F.2d 308, 310 (11th Cir.1987) ("When faced with various suggested interpretations of a statute, it is appropriate for a court to look to legislative history as a guide to its meaning"); Fitzpatrick v. IRS, 665 F.2d 327, 328-29 (11th Cir.1982) ("Because 'actual damages' has no 'plain meaning' in legal lexicon, we must turn to the legislative history and attempt to discern Congressional intent on this issue").
 
 
 27
 Although the 1984 amendments introduced in three places the novel phrase "occupational disease which does not immediately result in death or disability," see 33 U.S.C.A. Secs. 910(i), 912(a), 913(b)(2), the phrase is not explained, or indeed even mentioned, anywhere in the conference report or, so far as we can tell, elsewhere in the legislative history. However, the conference report on the 1984 amendments, which was approved by both the House and the Senate, includes the following section addressing the issue of the time of injury for compensation of occupational disease claims:
 
 DETERMINATION OF PAY
 
 28
 Section 10. The House amendment establishes that the time of injury in the case of a claim due to occupational diseases shall be the date of the onset of the disabling condition. The House amendment additionally establishes that in cases where the claimant was not employed, or not employed on a full-time basis, prior to onset of the disabling condition, the average weekly wage shall be established in accordance with subsections (a) through (d) of section 10, but in no case less than the current national average weekly wage.
 
 
 29
 The Senate has no comparable provision.
 
 
 30
 The Senate recedes, with a clarification that the "time of injury" for cases involving an occupational disease shall be the time when the claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware of the relationship between the employment, the disease, and the death or disability. The conferees specifically reject the date of last exposure to the injurious substance as the time of injury for determination of pay purposes.
 
 
 31
 H.R.Conf.Rep. No. 1027, 98th Cong., 2d Sess. 29-30,
 
 
 32
 reprinted in 1984 U.S.Code Cong. & Admin. News
 
 
 33
 2771, 2779-80 (emphasis added).
 
 
 34
 This section of the report draws no distinction among occupational diseases, but instead gives one standard for all occupational diseases. It is beyond dispute that hearing loss is an occupational disease, see e.g., Tisdale v. Director, Office of Workers' Comp. Programs, 698 F.2d 1233 (9th Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2454, 77 L.Ed.2d 1333 (1983); Travelers Ins. Co. v. Cardillo, 225 F.2d 137 (2d Cir.1955); Ronne v. Jones Oregon Stevedoring Co., 18 BRBS 165 (1985), and according to the conference report the time of injury for compensation of occupational diseases is the time of actual or constructive awareness of employment-related disability.
 
 
 35
 From examining the legislative history we conclude that the phrase in the statute, "occupational disease which does not immediately result in death or disability," does not reflect a congressional intention to treat hearing loss differently from other occupational diseases with respect to the time of injury for compensation purposes; we think that if Congress had had such an intention, knowing that it would have represented a significant change in the law,[7] it would not have agreed to a conference report that did not mention or explain the change anywhere, and indeed implied its nonexistence.
 
 
 36
 We reject the Director's position for another reason. The Director argues that the appropriate time of injury in hearing loss cases is the date of last exposure to the injurious workplace noise. However, the conference report "specifically reject[s] the date of last exposure to the injurious substance as the time of injury for determination of pay purposes." The Director has advanced no persuasive reason why this expression of congressional intent does not also apply to hearing loss claims. Granted, the Director argues that hearing loss is meaningfully different from other occupational diseases in a way that would render sensible a distinction between them, but even if Congress agreed that the diseases were different it would be entitled to ignore that difference if it thought it best. Congress plainly rejected the date of last exposure rule, and there is simply no indication that it meant to treat hearing loss any differently from any other occupational disease when it did so. Despite the Director's invitation, we will not infer such a distinction.
 
 
 37
 We therefore conclude that for purposes of fixing compensation in hearing loss cases, the time of injury is the time when the employee is or should be aware of "the relationship between the employment, the disease, and the disability." 33 U.S.C.A. Sec. 910(i). Other decisionmakers have reached the same result. See Machado v. General Dynamics Corp., 22 BRBS 176 (1989); see also Ingalls Shipbuilding v. Director, Office of Workers' Comp. Programs, 898 F.2d 1088 (5th Cir.1990).
 
 
 38
 The ALJ found that Sowell's time of awareness that his hearing loss was employment-related was on the date of his second audiogram. We hold that the ALJ's finding is supported by substantial evidence in the record.
 
 C. Other Issues
 
 39
 ADDSCO also argues that it advanced sufficient evidence to rebut the presumptive connection between the employment and the majority of the disability, and that the ALJ erred in fixing the amount of compensation. These issues are meritless. There is substantial evidence in the record to support the ALJ's determinations. We will therefore not reverse them.
 
 IV. Conclusion
 
 40
 We affirm the award of benefits to Sowell.
 
 
 41
 AFFIRMED.
 
 
 
 *
 Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 His employment records do not show how long he worked there, but they do show that he earned about $17 at ADDSCO in 1945. At then-current wages, he probably worked between seventeen and twenty-four hours for ADDSCO in 1945
 
 
 [2]
 The current regulations implementing the LHWCA combine the two requirements into one: "in the case of a hearing loss claim, the time for filing a claim does not begin to run until the employee receives an audiogram with the accompanying report which indicates the employee has sustained a hearing loss that is related to his or her employment." 20 C.F.R. Sec. 702.221(b) (1990)
 
 
 [3]
 In fact, the requirement that the employee be aware of the connection between the injury and the employment was added to the statute in 1972. Presumably, in 1969 when Sowell worked his last day for ADDSCO, awareness of such a connection would not have been required to begin the limitation period
 
 
 [4]
 See n. 3 earlier in this opinion
 
 
 [5]
 The ALJ found that Sowell was not aware of the relationship between his hearing loss and his employment until after his 1986 audiogram. The ALJ made no explicit finding about when Sowell "in the exercise of reasonable diligence should have been aware" of the relationship between the injury and his employment, but the sum of his factual findings requires the conclusion that the date when he became aware of the relationship and the date when he should have become aware are the same
 
 
 [6]
 The Director notes accurately that the ALJ's decision is unclear whether it is based on an assumption that the time of injury for compensation is the same as the time of injury for notice purposes or on an interpretation of 910(i)
 
 
 [7]
 See Machado v. General Dynamics Corp., 22 BRBS 176, 179 (1989) ("Hearing losses due to longterm exposure to noise have been routinely treated in the same manner as other occupational diseases") (cases and treatise cited)